**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | | |
|---|---|---|
| **Annette H. Ardis,** | ) | Civil Action No.:  3:26-cv-805-SAL |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **COMPLAINT** |
| | ) | |
| **LVNV Funding, LLC, and** | ) | **JURY TRIAL DEMANDED** |
| **Resurgent Capital Services L.P.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

## COMPLAINT

1.      This is an action brought by Plaintiff, Annette H. Ardis, for actual, statutory and punitive damages, attorneys' fees, and costs for Defendants' violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* (hereinafter "FCRA"), for actual and statutory damages, plus attorneys' fees, and costs for Defendants' violations of the Fair Debt Collection Practices Act, 15 U.S.C. §1692, *et seq.* (hereinafter "FDCPA"), and for compensatory and punitive damages for the Defendants' violations of South Carolina common law set forth herein.

2.      The FCRA exists to protect consumers' privacy and to impose upon those who trade in consumers' private information strict requirements to ensure that the information they report is as accurate as possible.

3.      Before the enactment of the FCRA, inaccurate and misleading information was identified as "the most serious problem in the credit reporting industry." 115 Cong. Rec. 2411 (Jan. 31, 1969). With this problem in mind, Congress enacted the FCRA "to prevent

consumers from being unjustly damaged because of inaccurate or arbitrary information in a credit report." S. Rep. No. 91-517 (1969).

4.     To accomplish Congress' goals, the FCRA contains a variety of requirements to protect consumers, including §§ 1681e and 1681s-2(b), which are two of the cornerstone provisions of the FCRA.

5.     One of the primary purposes of the FCRA is to assure "maximum possible accuracy" of consumer information to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

*See* 15 U.S.C. § 1681(a)(1).

6.     The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as *deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. * * * [A]s Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed* (emphasis added).

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 Cong. Rec. 36570 (1970)].

## JURISDICTION AND VENUE

7.     This Court has Jurisdiction under 15 U.S.C. §1681p, 15 U.S.C. §1692, and 28 U.S.C. §1331.

8.     Venue is proper in the Columbia Division because the Plaintiff resides in Lee County, and the Defendants transacted business throughout South Carolina and in this division.

## PARTIES

9.     Plaintiff, Annette H. Ardis, is a resident and citizen of the State of South Carolina, Lee County, and is over the age of twenty-one (21) years.  Plaintiff is a consumer as that term is defined by the FCRA, 15 U.S.C. §1681a(c).

10.     Defendant LVNV Funding LLC ("LVNV") is a Delaware corporation that may be served with process through its registered agent for service of process, Corporation Service Company, 100 Coastal Drive, Suite 210, Charleston, South Carolina 29492.  Defendant LVNV was in all respects and at all times relevant herein doing business in the state of South Carolina and in this division.

11.     Defendant LVNV is a debt buyer that purchases portfolios of consumer debt, including defaulted debts previously owned by banks, finance companies and other debt buyers.

12.     LVNV has no employees.

13.     LVNV's business is to invest in consumer debt and loan assets.  LVNV then outsources the management of its portfolio of accounts to Defendant Resurgent Capital Services L.P. ("Resurgent").

14.     Defendant Resurgent is a Delaware corporation that may be served with process through its registered agent for service of process, Corporation Service Company, 100 Coastal Drive, Suite 210, Charleston, South Carolina 29492. Defendant Resurgent was in all respects and at all times relevant herein doing business in the state of South Carolina and in this division.

15.     Defendant Resurgent is a "debt collector" as that term is defined in 15 U.S.C. 1692a(6) and is regularly engaged in the collection of debts.

16.     Defendant Resurgent performs all actions on behalf of LVNV as LVNV has no employees.

17.     Defendant Resurgent exercises sole discretion over the servicing of debts for LVNV-owned accounts and determines the appropriate course of action for each account it manages for LVNV.

18.      Defendants LVNV and Resurgent each acted in concert together with the other, and contributed to the damages caused to the Plaintiff.

19.     All acts done by Defendant Resurgent were done on its own behalf and on behalf of Defendant LVNV.

20.     Defendant LVNV acted as principal over its agent, Defendant Resurgent, and maintained control over all actions taken by Defendant Resurgent.

21.     Defendants are furnishers of information to multiple Consumer Reporting Agencies ("CRAs"), including Equifax, Experian, and TransUnion, in that they regularly report account data on consumer credit cards.

## FACTUAL ALLEGATIONS

22.     In 2019, Plaintiff first became the victim of identity theft and had accounts opened in her name without her knowledge or permission.

23.     In 2020, Plaintiff filed a police report, filed an identity theft affidavit with the Federal Trade Commission, and placed a fraud alert on all of her credit reports.

24.     On or about March 30, 2020, Experian sent Plaintiff a postcard confirming a fraud alert had been placed on her Experian credit reports.

25.     On or about March 30, 2020, TransUnion sent Plaintiff a postcard confirming a fraud alert had been placed on her TransUnion credit reports.

26.     On or about March 31, 2020, Equifax sent Plaintiff a letter confirming the fraud alert had been placed on her Equifax credit reports.

27.     On or about January 5, 2023, Plaintiff notified Defendants that the Credit One Bank, N.A., account ending 3230 was fraudulent.

28.     On or about January 5, 2023, Defendants sent Plaintiff a letter requesting additional documents concerning her claim of identity theft.

29.     Thereafter, on or about January 25, 2023, Defendants sent Plaintiff a letter on account ending 3230 stating that they had researched her claim and the account had been closed.

30.     In 2024, Plaintiff began receiving debt collection letters in the mail for credit card accounts that did not belong to her.  This was extremely frightening and stressful to Plaintiff because she did not have or use credit cards, as she had always been adamant about only using cash or checks as forms of payment.

31.     In February 2025, worried that she was again the victim of identity theft, Plaintiff tried to obtain copies of her credit reports online.  Unfortunately, when Plaintiff tried to obtain a copy of her Equifax credit report, she was denied access.  When Plaintiff tried to obtain a copy of her TransUnion credit report, she could not answer the identity verification questions because the questions contained information known only to the identity thief.

32.     Subsequently, Plaintiff learned that the identity thief was living at 427 New Castle Road, Greenville, South Carolina.  Plaintiff also learned the thief paid an electricity bill for 427 New Castle with one of the fraudulent credit cards opened in Plaintiff's name.

33.     On or about February 7, 2025, Plaintiff called the credit reporting agencies to request copies of her credit reports.

34.      On February 7, 2025, Plaintiff filed a police report with the Lee County Sheriff's Office.

35.     On February 7, 2025, Plaintiff also filed an Identity Theft Report with the Federal Trade Commission wherein Plaintiff provided the address used by the identity thief to open the fraudulent accounts.  Plaintiff also provided the police officer's name and report number for Plaintiff's police report.

36.     On or about February 25, 2025, Plaintiff finally received a copy of her Equifax credit report in the mail and learned that it was full of inaccurate information.  Specifically, Defendants were reporting a collection account as "LVNV Funding, LLC Care of Resurgent Capital Services LP, Acct. No. *0842" (hereinafter referred to as the "Account") as belonging to Plaintiff.  The Account was originally a Credit One Bank account.

37.     Plaintiff did not have any past due accounts and did not owe the Account being

reported by Defendants.

38.    On or about February 25, 2025, Plaintiff received a copy of her Experian credit report. Upon review of her credit report, Plaintiff learned she had a FICO score of 565, which was labeled as poor.  She also discovered that numerous fraudulent accounts were reporting on her credit, as well as an address where she had never lived, three variations of her social security number, and two phone numbers, none of which belonged to Plaintiff.

39.    Plaintiff's February 25, 2025, Experian credit report specifically showed Defendant was reporting the Account as a collection account belonging to Plaintiff with $993 past due as of February 2025.

40.    On or about February 25, 2025, TransUnion sent Plaintiff a letter stating it was unable to locate a credit report for Plaintiff based on the information she provided.  Plaintiff was asked to provide copies of two documents to verify her current address, Social Security number, and date of birth.

41.    Plaintiff immediately forwarded TransUnion a copy of her driver's license and her Social Security benefits statement.

42.    On or about March 16, 2025, Equifax sent Plaintiff a letter stating an initial fraud alert had been added to Plaintiff's Equifax credit file.

43.    On or about March 16, 2025, TransUnion sent Plaintiff a second letter requesting proof of her current mailing address.

44.    On or about March 24, 2025, Plaintiff sent a dispute letter to Equifax ("First Equifax Dispute") stating the Account was a fraudulent account opened in Plaintiff's name without her knowledge and asking that it be removed from her credit report.  With her dispute,

Plaintiff included her address, full Social Security number, and date of birth. Equifax received Plaintiff's dispute on March 28, 2025, and thereafter forwarded same to Defendants.

45.     On or about March 24, 2025, Plaintiff sent a dispute letter to Experian ("First Experian Dispute") stating she had been the victim of identity theft and fraud, and the Account was a fraudulent account opened in her name by a woman who stole her identity. Plaintiff requested Experian remove the Account from her credit report. Plaintiff provided her address, full social security number, and date of birth in her letter, and requested Experian add a fraud alert to her credit file.   Upon receipt of Plaintiff's dispute, Experian forwarded same to Defendants.

46.     On or about March 24, 2025, Plaintiff mailed TransUnion a completed Alert Request Form along with a copy of her driver's license and Verizon telephone bill.

47.     On or about March 29, 2025, TransUnion sent Plaintiff a postcard informing her a fraud alert had been added to her TransUnion credit report.

48.     On March 29, 2025, Equifax sent Defendants an Automated Consumer Dispute Verification ("ACDV") informing Defendants that Plaintiff disputed the Account as "True Identity Fraud," "Account fraudulently opened."  Equifax also informed Defendants that Plaintiff disputed the former address of 427 New Castle Rd, Greenwood, South Carolina.

49.     On or about March 30, 2025, Equifax sent Plaintiff a letter stating it was unable to locate a credit file in its database with the identification information Plaintiff provided. Equifax requested Plaintiff send them two different items – one to verify Plaintiff's identity and the other to verify her current address.  Thereafter, Plaintiff mailed Equifax another

copy of her driver's license.

50.     On April 2, 2025, TransUnion received Plaintiff's Alert Request Form and proof of identity and address, but never provided Plaintiff with a copy of her TransUnion credit report.

51.     On April 16, 2025, Defendants responded to Equifax's ACDV by wrongfully verifying the fraudulent Account belonged to Plaintiff and wrongfully updating the fraudulent address on the Account to Plaintiff's current, correct address.  Defendants did not add a compliance condition code noting the Account was disputed.

52.     On or about April 16, 2025, Defendants sent Plaintiff a letter stating Resurgent Capital Services L.P. manages the Account for LVNV Funding LLC and that they had initiated a review of the inquiry received either directly or from Halsted Financial Services, LLC, the current servicer of the Account.

53.     On or about April 21, 2025, Defendants responded to the ACDV from Experian by verifying the Account information as accurate, updating information unrelated to the dispute, and noting the Account as disputed.

54.     On or about April 29, 2025, Defendants sent Plaintiff a letter to her current home address stating that Plaintiff's recent communication regarding identity theft or fraudulent charges in connection with the Account had been reviewed, but Defendants were unable to validate Plaintiff's claim.  Included with the letter was a blank Identity Theft Affidavit and a copy of a statement from the Account for the billing period April 13, 2023 to May 12, 2023, addressed to 427 Newcastle Rd, Greenwood, SC 29649-9593—the address used by the identity thief.  At the time of sending Plaintiff its April 29, 2025, letter, Defendants had

previously been made aware of the fraudulent address by way of an ACDV from Equifax and had updated Plaintiff's address to her current home address in its response to Equifax's ACDV.  Defendants informed Plaintiff that if she wanted them to investigate further, she would need to provide one or more of the following:  a police report, a completed and notarized identity theft affidavit, letter(s) from the original creditor or previous owner of the Account, court documents showing the perpetrator was prosecuted for using the Account, and/or any other documents supporting her claim.

55.     On or about May 25, 2025, Experian sent Plaintiff a postcard confirming an initial security alert had been added to her Experian credit file.

56.     On or about May 25, 2025, Experian also forwarded its Dispute Results to Plaintiff stating its reinvestigation of Plaintiff's disputes was now complete. Experian informed Plaintiff that since it had forwarded the February 25, 2025, credit report to Plaintiff, Experian had discovered an inaccuracy.  Accordingly, Experian stated it was providing Plaintiff with a new credit report with the inaccuracy corrected. However, Experian did not disclose to Plaintiff what information was corrected.  Upon review of the Investigation Results and credit report, the Account reported by Defendants was still reporting on Plaintiff's credit report as a derogatory, collection account belonging to Plaintiff.

57.     On or about June 13, 2025, Plaintiff sent a letter to Defendants.  Plaintiff informed Defendants she had received their letter stating they were unable to validate her claim of identity theft and requesting additional documentation to investigate the claim.  In response to Defendants' letter, Plaintiff enclosed a copy of the police report she filed, as well as a copy of the Identity Theft Affidavit she executed.  Plaintiff also informed Defendants she

did not have any letters from the original creditor because it was not her Account, and she could not provide court documents with regard to the perpetrator because she was not aware of the identity of the thief. Plaintiff specifically asked Defendants to remove the fraudulent Account from her credit reports. Plaintiff's address, date of birth and full social security number were also provided in her letter.

58.    On or about June 13, 2025, Plaintiff sent a second dispute letter to Equifax ("Second Equifax Dispute"). Plaintiff informed Equifax she had mailed a copy of her driver's license and still had not received a response to her First Dispute. Plaintiff again informed Equifax she had been the victim of identity theft and fraud, and requested Equifax remove the fraudulent Account from her credit report. Plaintiff provided Equifax with another copy of her driver's license and a copy of her 2022 Social Security Benefit statement showing her social security number. Plaintiff's address, date of birth and full social security number were also provided in her letter. Equifax received Plaintiff's second dispute on June 18, 2025, and thereafter forwarded same to Defendants.

59.    On or about June 13, 2025, Plaintiff sent a second dispute letter to Experian ("Second Experian Dispute") stating she had received the results of Experian's reinvestigation into her disputes, but the fraudulent Account continued to be reported on her credit report. Plaintiff again told Experian she had been the victim of identity theft and fraud and disputed the Account as a fraudulent account opened by the identity thief. Plaintiff provided Experian with a copy of the police report she had filed regarding the theft of her identity. Plaintiff also provided Experian her address, date of birth and full social security number in the letter. Experian received Plaintiff's second dispute and police

11

report on June 18, 2025, and thereafter forwarded both to Defendants.

60.     On or about June 13, 2025, frustrated that she had still not been able to obtain a copy of her TransUnion credit report, Plaintiff sent a dispute letter to TransUnion ("First TransUnion Dispute").  In her letter, Plaintiff specifically informed TransUnion that she had never received a copy of her TransUnion credit report even after mailing TransUnion proof of her identity.  Plaintiff informed TransUnion she had been the victim of identity theft and fraud, and requested TransUnion remove the fraudulent Account from appearing on her credit report.  Plaintiff provided TransUnion her address, Social Security number, date of birth, and a copy of her driver's license.   Additionally, Plaintiff requested TransUnion send her a complete copy of her credit report. TransUnion received Plaintiff's dispute on June 18, 2025, and thereafter forwarded same to Defendants.

61.     Defendant Resurgent received Plaintiff's June 3, 2025, letter and accompanying documents on June 16, 2025.

62.     On or about June 18, 2025, TransUnion sent Plaintiff a letter regarding Remedying the Effects of Identity Thef and setting out some of her rights under the Fair Credit Report Act.

63.     On June 20, 2025, Equifax sent Defendants another ACDV informing Defendants that Plaintiff disputed the Account as true identity fraud.

64.     On or about June 23, 2025, Defendants sent Plaintiff a letter stating Resurgent Capital Services L.P. manages the Account for LVNV Funding LLC and had initiated a review of the inquiry received either directly or from Halsted Financial Services, LLC, the current servicer of the Account.

65.     On July 3, 2025, Defendants responded to the ACDV from Equifax and again verified the Account as belonging to Plaintiff.  Defendants did not add a compliance condition code noting the Account was disputed.

66.     On or about July 3, 2025, Defendants also responded to the ACDV from Experian and again verified the Account belonged to Plaintiff.

67.     On or about July 3, 2025, Defendants sent Plaintiff a letter again informing Plaintiff that if Plaintiff would like for them to investigate her dispute further, she would need to provide them one or more of the same documents Plaintiff had previously provided to Defendants and Defendants received on June 6, 2025.  Defendants again stated that "after receiving the requested information, we will proceed with our investigation of this matter."

68.     On or about July 3, 2025, Defendants also sent Plaintiff a letter stating that after review of her claim, and the Account, they were unable to validate Plaintiff's claim.

69.     On or about July 9, 2025, TransUnion sent Plaintiff its Investigation Results wherein TransUnion informed Plaintiff that Defendants verified the Account as accurate. Accordingly, the Account continued to be reported on Plaintiff's TransUnion credit report as a derogatory, charged off account belonging to Plaintiff.

70.     On or about July 9, 2025, five months after Plaintiff first requested it, TransUnion finally provided Plaintiff with a copy of her TransUnion credit report.  Upon review, Plaintiff was devastated to learn her credit report contained several fraudulent accounts, including the Account reported by Defendants.

71.     On July 11, 2025, Equifax sent Defendants an ACDV informing Defendants that Plaintiff disputed the Account as true identity fraud.

13

72.   On or about July 11, 2025, Equifax forwarded its Reinvestigation Results to Plaintiff. In these Results, Equifax informed Plaintiff that the disputed Account was not currently reporting on Plaintiff's Equifax credit file.

73.   On or about July 13, 2025, Experian forwarded its Dispute Results to Plaintiff.  In these results, Experian informed Plaintiff that with regard to the Account, Defendants had certified to Experian that the information was accurate.  As a result, the Account continued to be reported as a derogatory account belonging to Plaintiff.

74.   On or about July 17, 2025, Defendants sent Plaintiff two (2) identical letters regarding the Account.  In both letters, Defendants claimed they had completed a review of Plaintiff's claim of identity theft or fraudulent charges on the Account and were unable to validate Plaintiff's claim.  Like the previous letters, these letters again informed Plaintiff that if she would like for Defendants to investigate her dispute further, she would need to provide one or more of the following items:  a police report, a completed and notarized identity theft affidavit, letter(s) from the original creditor or previous owner of the Account, court documents showing the perpetrator was prosecuted for using the Account, and/or any other documents supporting her claim.

75.   On July 22, 2025, Defendants responded to Equifax's ACDV and again verified the Account belonged to Plaintiff.  Defendants did not add a compliance condition code noting the Account was disputed.

76.   On or about July 31, 2025, Plaintiff sent a second letter to Defendant Resurgent. Plaintiff informed Defendants she had received their July 3, 2025, letter, and two letters dated July 17, 2025, which were identical with the exception of two letters providing a

14

statement from Credit One of the fraudulent Account. Plaintiff also informed Defendants she had previously provided them with a copy of her police report with her June 23, 2025, letter, but she was enclosing another copy, together with another copy of the Identity Theft Affidavit, for their review.

77.    Defendants received Plaintiff's second dispute on August 2, 2025.

78.    On or about July 31, 2025, Plaintiff sent a third dispute letter to Experian ("Third Experian Dispute") stating she had received Experian's investigation results, but the fraudulent Account was still reporting on her credit report. Plaintiff again disputed the Account as a fraudulent account and asked for it to be removed from her credit report immediately. With her dispute, Plaintiff provided another copy of her police report. Experian received Plaintiff's third dispute and police report on August 5, 2025, and thereafter forwarded same to Defendants.

79.    On or about July 31, 2025, Plaintiff sent a second dispute letter to TransUnion ("Second TransUnion Dispute"). In her letter, Plaintiff stated she had received TransUnion's Investigation Results, but the fraudulent Account was still reporting on her credit report as belonging to Plaintiff. With her dispute, Plaintiff provided TransUnion a copy of the police report she filed regarding the theft of her identity and another copy of her driver's license. TransUnion received Plaintiff's second dispute on August 5, 2025, and thereafter forwarded same to Defendants.

80.    On or about August 6, 2025, Experian forwarded a letter to Plaintiff, wherein Experian stated it had received Plaintiff's dispute, but didn't believe it actually came from Plaintiff. As a result, Experian refused to take any action on Plaintiff's disputes. Plaintiff

was instructed that, if inaccurate information was on her credit report, she should call Experian at 833-421-3400.

81.     On or about August 6, 2025, in response to Plaintiff's dispute and police report, TransUnion sent Plaintiff correspondence admitting it had received Plaintiff's request to block the Account due to fraud, but refusing to do so.

82.     On or about August 11, 2025, Equifax sent Plaintiff a letter stating it had received Plaintiff's police report and request to block the Account from her credit file, but Equifax refused to block the Account.

83.     On or about August 27, 2025, Defendants sent Plaintiff the exact same letter as its three previous letters again informing Plaintiff that Defendants had completed their review of Plaintiff's claim of identity theft or fraudulent charges on the Account and were unable to validate Plaintiff's claim.

84.     On or about August 28, 2025, TransUnion sent Plaintiff its Investigation Results showing that the Defendants had again verified the Account as accurate and updated the information being reported.   Accordingly, TransUnion continued reporting the derogatory, fraudulent Account as belonging to Plaintiff on her credit report.

85.     On August 30, 2025, Equifax sent Defendants an ACDV informing Defendants that Plaintiff disputed the Account as true identity fraud.

86.     On September 5, 2025, Defendants again verified the Account belonged to Plaintiff. Defendants did not add a compliance condition code noting the Account was disputed.

87.     On September 9, 2025, Plaintiff called Experian at the number provided in Experian's August 2, 2025, letter to Plaintiff.   During this call, Plaintiff spoke with

16

Michelle and two other representatives.   With each person, Plaintiff explained she was the victim of identity theft and she needed the fraudulent accounts, including Defendants' Account, removed.   Experian's employees told Plaintiff she needed to contact the individual creditor because there was nothing Experian could do.  Experian's employees specifically admitted to Plaintiff that all Experian does is forward her dispute to the company and if the company verifies the account, it remains on the credit report.

88.    On or about September 9, 2025, Plaintiff sent TransUnion a third dispute letter ("Third TransUnion Dispute") stating she had received TransUnion's Investigation Results and TransUnion's letter wherein TransUnion refused to block the reporting of the fraudulent Account.  Plaintiff again requested that TransUnion remove the Account as it was a fraudulent, and enclosed another copy of the police report she had filed and her driver's license.   TransUnion received Plaintiff's third dispute on September 15, 2025, and thereafter forwarded same to Defendants.

89.    On or about September 17, 2025, TransUnion sent Plaintiff correspondence stating it had received Plaintiff's second fraud block request for the Account.  Despite receipt of Plaintiff's valid police report, TransUnion again refused to block the fraudulent Account from Plaintiff's credit report.

90.    On or about October 7, 2025, Defendants sent Plaintiff a letter stating Resurgent Capital Services L.P. Manages the Account for LVNV Funding LLC and had initiated a review of the inquiry received either directly or from Tate and Kirlin Associates, Inc., the current servicer of the Account.

91.    On or about October 10, 2025, Defendants sent Plaintiff another copy of the same

letter stating Plaintiff's claim of identity theft on the Account had been reviewed and Defendants were unable to validate said claim. Plaintiff was again told that if she wanted Defendants to investigate further, she could provide additional documents.

92.     On or about October 10, 2025, TransUnion sent Plaintiff Investigation Results showing that Defendants had again verified the Account as accurate. Accordingly, despite repeated receipt of Plaintiff's dispute and a copy of her police report, TransUnion continued allowing Defendants to report the fraudulent Account as belonging to Plaintiff on her TransUnion credit reports.

93.     To date, Defendants continue to report the derogatory, fraudulent Account as belonging to Plaintiff to the credit reporting agencies, as well as to numerous third parties, including other debt collectors such as Halstead and Tate and Kirlin Associates.

94.     From at least January 2023 through the present, Defendant has reported false, libelous, inaccurate, and defamatory information regarding the Plaintiff to the national credit bureaus and to numerous third parties. During the past two years while Defendants were reporting the fraudulent Account as belonging to Plaintiff, said information was provided to and/or viewed by FebDestiny, Capital One, Credit Fresh Marketing, TBOM/Aspire, T-Mobile, Cap One Auto, The Hartford, Synovus/Verv-FirstDigital, OneMain Financial, Tab BankNetCredit, QuinStreet, AXCSSFN/CNGO, CBW/Credit Fresh, Clarity Services, Inc., Clarity/Advance Financia, Clarity/CBW/Credit Fresh, Clarity/CNU Online Holdi, Clarity/Finwise-OppLoans, Conn Appliances, Inc., Montgomery Ward/DM Serc, Resurgent Capital Servic, Seventh Avenue/Dm Servi, Unknown, MDG USA Inc, Leadsmarket.com LLC, Summit Management Company, LLC,

Finance, Verizon, and ConsumerInfo.com.

95.     Defendants received at least eight (8) ACDVs from the credit reporting agencies and failed to investigate each ACDV.

96.     Defendants 'knowing and repeated violations of the FCRA warrants an award of punitive damages. *See, e.g., Younger v. Experian Info. Sols. Inc.,* Case No. 2:15-cv-0952-SGC, at *30 (N.D. Ala. Mar. 21, 2019) (awarding punitive damages for repeated, willful violations of the FCRA).

**COUNT ONE**
**(Fair Credit Reporting Act)**

97.     The Plaintiff adopts the averments and allegations of paragraphs 22 through 96 hereinbefore as if fully set forth herein.

98.     Defendants negligently violated 15 U.S.C. §1681s-2(b)(1)(A) by failing to conduct an investigation after receiving notice that the Plaintiff disputed the Account information said Defendant had provided to a consumer reporting agency.

99.     Defendants negligently violated 15 U.S.C. §1681s-2(b)(1)(B) by failing to review all relevant information provided by the consumer reporting agency pursuant to §1681i.

100.    Defendants negligently violated 15 U.S.C. §1681s-2(b) by failing to conduct an investigation as to the accuracy of the information reported by the Defendant to the consumer reporting agencies.

101.    Defendants negligently violated 15 U.S.C. §1681s-2(b)(1)(C) by reporting inaccurate, incomplete, false, and misleading results of the investigation, if any, to the consumer reporting agencies.

102.   Defendants negligently violated 15 U.S.C. §1681s-2(b)(1)(D) by failing to notify all consumer reporting agencies that the reporting of the Account the subject of this action was inaccurate, incomplete, false, and misleading.

103.   The law in this District, the Fourth Circuit, and even nationally has long ago been articulated to require a detailed and searching investigation by a furnisher when it receives a consumer's FCRA dispute through a consumer reporting agency.

104.   Defendants completely failed and/or refused to conduct a detailed and searching inquiry as required by the FCRA.  Instead, Defendants simply verified the Account each and every time it received an ACDV regarding Plaintiff's dispute of the Account as fraudulent, even after Defendants received Plaintiff's police report, both directly and indirectly from the Plaintiff through the credit reporting agencies.

105.   As a result of Defendants' violations set forth above, the Plaintiff suffered, continues to suffer, and will suffer future damages, including, but not limited to, damage to Plaintiff's credit score and credit reputation, severe and unrelenting anxiety, worry, inability to focus, constant racing thoughts, feeling a loss of control of her life, fear, loss of sleep, headaches, irritability, loss of enjoyment of life, physical pain and sickness, frustration, humiliation, embarrassment and mental anguish.  Additionally, the damage to Plaintiff's credit score and credit reputation caused her to not receive promotional offers of credit.  Plaintiff is entitled to actual damages in an amount to be determined by the jury.

106.   In addition, Plaintiff has incurred litigation expenses and attorneys' fees which, but for the acts and omissions of Defendants alleged herein, would not have been necessary.

107.   Plaintiff is entitled to her attorneys' fees, pursuant to 15 U.S.C. §1681n(a).

## COUNT TWO
### (Fair Credit Reporting Act)

108.   The Plaintiff adopts the averments and allegations of paragraphs 22 through 107 hereinbefore as if fully set forth herein.

109.   Defendants willfully violated 15 U.S.C. §1681s-2(b)(1)(A) by failing to conduct an investigation after receiving notice that the Plaintiff disputed the Account information Defendants had provided to a consumer reporting agency.

110.   Defendants willfully violated 15 U.S.C. §1681s-2(b)(1)(B) by failing to review all relevant information provided by the consumer reporting agency pursuant to §1681i.

111.   Defendants willfully violated 15 U.S.C. §1681s-2(b) by failing to conduct an investigation as to the accuracy of the information reported by Defendants to a consumer reporting agency.

112.   Defendants willfully violated 15 U.S.C. §1681s-2(b)(1)(C) by reporting inaccurate, incomplete, false, and misleading results of the investigation, if any, to the consumer reporting agency.

113.   Defendants willfully violated 15 U.S.C. §1681s-2(b)(1)(D) by failing to notify all consumer reporting agencies that the reporting of the Account the subject of this action was inaccurate, incomplete, false, and misleading.

114.   The law in this District, the Fourth Circuit, and even nationally has long ago been articulated to require a detailed and searching investigation by a furnisher when it receives a consumer's FCRA dispute through a consumer reporting agency.

115.   Defendants willfully and intentionally failed and/or refused to conduct a detailed

and searching inquiry as required by the FCRA. Instead, Defendants simply verified the Account each and every time it received an ACDV regarding Plaintiff's dispute of the Account as fraudulent, even after Defendants received Plaintiff's police report.

116.   As a result of Defendants' violations set forth above, the Plaintiff suffered, continues to suffer, and will suffer future damages, including, but not limited to, damage to Plaintiff's credit score and credit reputation, severe and unrelenting anxiety, worry, inability to focus, constant racing thoughts, feeling a loss of control of her life, fear, loss of sleep, headaches, irritability, loss of enjoyment of life, physical pain and sickness, frustration, humiliation, embarrassment and mental anguish. Additionally, the damage to Plaintiff's credit score and credit reputation precluded her from receiving promotional offers of credit. Plaintiff is entitled to actual damages in an amount to be determined by the jury.

117.   Due to Defendants' willful violations of the FCRA, Plaintiff's entitled to punitive damages in an amount to be determined by the jury.

118.   In addition, Plaintiff has incurred litigation expenses and attorneys' fees which, but for the acts and omissions of Defendants alleged herein, would not have been necessary.

119.   Plaintiff is entitled to her attorneys' fees, pursuant to 15 U.S.C. §1681n(a).

## COUNT THREE
### (Violation of the Fair Debt Collection Practices Act)

120.   Plaintiff hereby adopts all of the allegations set forth in paragraphs 22 through 119 as if set forth fully herein.

121.   Within the one year prior to the filing of this lawsuit, Defendants have engaged in

collection activities and practices in violation of the Fair Debt Collection Practices Act with respect to the Plaintiff and an alleged consumer debt.

122.    Defendants are a debt collector as that term is defined in 15 U.S.C. 1692a(6) and is regularly engaged in the collection of debts.

123.    Defendants communicated to a person credit information which was known, or which should have been known to be false in violation of §1692e(8).  Specifically, Defendants reported to the Credit Reporting Agencies and other debt collectors that Plaintiff owed a derogatory collection Account.

124.    As a proximate result of Defendants' actions, the Plaintiff was caused to suffer damage to her credit reports and reputation, worry, humiliation, fear, loss of sleep, anxiety, nervousness, loss of enjoyment of life, physical sickness, physical pain and mental anguish for which she seeks the maximum statutory damages, actual damages, plus attorneys' fees and costs.

## COUNT FOUR
### (Defamation, Libel, and Slander)

125.    The Plaintiff adopts the averments and allegations of paragraphs 22 through 124 hereinbefore as if fully set forth herein.

126.    Defendants willfully, wantonly, recklessly and/or maliciously published and communicated false and defamatory statements regarding Plaintiff to third parties and the public at large.  Said statements harmed Plaintiff's reputation and caused Plaintiff physical sickness, mental anguish, and emotional distress.

127.    Said communications were false in that Plaintiff was not indebted to Defendants.

Plaintiff did not owe any balance on the Account the subject of this action as said Account was clearly fraudulent.

128.   Defendants' false and defamatory statements have harmed the reputation of Plaintiff and/or deterred third persons from associating with Plaintiff.  Specifically, Defendants reported the Account to the national credit reporting agencies as belonging to Plaintiff so the Account would appear on Plaintiff's credit reports.  Plaintiff's credit reports were viewed by numerous third parties as set out above and Plaintiff suffered damages.

129.   Defendants communicated to third parties and the public at large false information concerning Plaintiff, disseminating and imputing false and misleading credit worthiness information concerning Plaintiff, including but not limited to reporting that Plaintiff owed the Account the subject of this action.

130.   At the time said communications were made, Defendants knew or should have known the falsity of the communications or recklessly disregarded the potential inaccuracy of the information, yet knowingly, willfully, and maliciously communicated the falsity.

131.   As a result of Defendants' intentional communications to third parties of the false information, Plaintiff was caused to suffer injury to her reputation in the eyes of her community and the public at large, and was forced to endure credit reporting of the Account in spite of the fact that Plaintiff did not owe the Account as it was fraudulently opened in her name without her knowledge or permission.

132.   As a proximate consequence of said defamation, libel and slander, Plaintiff was caused to have negative credit reports, to be held up to public ridicule or shame,  and made to suffer humiliation, anxiety, stress, headaches, loss of sleep, anger, worry, physical

sickness, loss of enjoyment of life, and mental anguish for which she claims compensatory and punitive damages.

## **AMOUNT OF DAMAGES DEMANDED**

WHEREFORE, PREMISES CONSIDERED, Plaintiff demands a judgment against Defendants for the following:

A.     Actual and statutory damages from Defendants pursuant to 15 U.S.C. §1681n(a)(1)(A) and/or 15 U.S.C. §1681o(a)(1).

B.     Punitive damages from Defendants pursuant to 15 U.S.C. §1681n(a)(2);

C.     Costs and reasonable attorney's fees from Defendants pursuant to 15 U.S.C. §1681n(a)(3) and/or 15 U.S.C. §1681o(a)(2);

D.     For relief in amounts or other appropriate relief as may be determined by the Court pursuant to 15 U.S.C. §1692 to include the Plaintiff's actual damages, statutory damages of one thousand ($1,000.00) dollars for Plaintiff, as well as attorney's fees and costs pursuant to 15 U.S.C. §1692 from Defendants;

E.     For compensatory and punitive damages in an amount to be determined by a struck jury for Defendants' defamation, libel and slander of Plaintiff;

F.     For this matter to be heard by a jury; and

G.     For such other and further relief as this Court deems necessary and proper.


/s/ *Penny Hays Cauley*
Penny Hays Cauley, Fed. ID No. 10323
Attorney for Plaintiff

**OF COUNSEL:**
HAYS CAULEY, P.C.

1303 West Evans Street
Florence, SC 29501
(843) 665-1717
phc917@hayscauley.com

**PLAINTIFF DEMANDS A TRIAL BY STRUCK JURY ON ALL COUNTS**

*/s/ Penny Hays Cauley*
Of Counsel

**DEFENDANT TO BE SERVED VIA CERTIFIED MAIL:**
LVNV Funding, LLC
c/o Corporation Service Company – Registered Agent
100 Coastal Drive, Suite 210
Charleston, South Carolina 29492

Resurgent Capital Services L.P.
c/o Corporation Service Company – Registered Agent
100 Coastal Drive, Suite 210
Charleston, South Carolina 29492